UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>              Plaintiff,<br><br>v.<br><br>HASAN SARWAR a/k/a ALEXANDER SARWAR d/b/a PROFIT MANAGEMENT INT and<br>RACHIDA ELFRIMI d/b/a PROFIT MANAGEMENT,<br><br>              Defendants. | Civ. No. 17-7442<br><br>**ECF Case**<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES PURSUANT TO THE COMMODITY EXCHANGE ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by its attorneys, alleges as follows:

**I.**

**SUMMARY OF DEFENDANTS' VIOLATIONS
OF THE COMMODITY EXCHANGE ACT**

1. From at least October 2012 through at least July 2014 (the "Relevant Period"), Defendants Hasan Sarwar ("Sarwar"), and Rachida Elfrimi ("Elfrimi") operated a Ponzi scheme by which they fraudulently solicited and received at least $1,191,000 from over 40 individuals ("pool participants") for the purpose of trading in commodity interests, including commodities for future delivery ("futures"), in connection with a commodity pool named Profit Management.

2. Potential pool participants were solicited to invest in the Profit Management pool by false claims of success in futures trading and promises of substantial monthly returns. In reality, Defendants did not disclose to potential pool participants that the pool did not engage in any futures trading, that Defendant Sarwar had engaged in unprofitable futures trading for his own account, that the pool had not earned any futures trading profits from which to pay promised

monthly returns, and that pool participant funds were not placed in a Profit Management pool account under the name of a separate legal entity, but were instead deposited into bank accounts held in the names of and controlled by Sarwar and Elfrimi.

3. Sarwar then transferred some of the money received from pool participants to a trading account held under his name. The rest of the money was used either for business or personal expenses, or Ponzi-style payments to pool participants from other participants' funds. Ultimately, less than half of pool participants' funds were transferred to Sarwar's personal futures trading accounts. Sarwar was not a successful trader. All but about $5,800 of the pool participants' money transferred by Sarwar to his personal trading account was lost through trading and payment of futures trading account fees.

4. By virtue of this conduct and the further conduct described herein, Defendants Sarwar and Elfrimi engaged, are engaging or are about to engage in fraud, commingling of pool funds with funds of others, failing to operate the pool as an entity cognizable as a legal entity separate from that of the commodity pool operator ("CPO"), and making use of means of interstate commerce as a CPO without registering as a pool operator, in violation of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1-26 (2012), and the Commission Regulations promulgated thereunder ("Regulations"), 17 C.F.R. pt. 1-190 (2017). Specifically, Defendants have violated Sections 4b(a)(1)(A) and (C), 4*o*(1)(A) and (B), and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C), 6*o*(1)(A)–(B), 6m(1) (2012), and Regulation 4.20(a) and (c), 17 C.F.R. § 4.20(a), (c) (2017).

5. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. In addition, the Commission seeks civil monetary penalties,

restitution, disgorgement, and remedial ancillary relief, including, but not limited to, trading and registration bans, rescission, pre- and post-judgment interest, and such other relief as the Court deems necessary or appropriate.

6. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in this Complaint, or similar acts and practices, as more fully described below.

## II.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress. Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

8. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants' acts and practices in violation of the Act and Regulations occurred, are occurring, or are about to occur within this District, among other places.

## III.

## PARTIES

9. **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the

Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1-190 (2017).

10.     **Defendant Hasan Sarwar, a/k/a Alexander Sarwar**, currently resides in Rancho Cucamonga, California.  Sarwar is married to Elfrimi.  Sarwar has never been registered with the Commission.  Sarwar did business as "Profit Management Int."  On January 28, 2013, Sarwar procured a Fictitious Firm Name certificate from the county clerk's office for Clark County, Nevada, in the name of "Profit Management Int."

11.     **Defendant Rachida Elfrimi** currently resides in Rancho Cucamonga, California.  Elfrimi is married to Sarwar.  Elfrimi has never been registered with the Commission.  Elfrimi did business as "Profit Management."  On October 18, 2012, Elfrimi procured a Fictitious Business Name certificate in the name of "Profit Management" from the county clerk's office for San Bernardino County, California, where both she and Sarwar lived.

### IV.

### FACTS ESTABLISHING DEFENDANTS' VIOLATIONS OF THE COMMODITY EXCHANGE ACT

**A.    Defendants' Misrepresentations and Omissions about Their Background and Profitability and the Profitability of Participant Investments**

12.     During the Relevant Period, by advertising in newspapers and on the internet, Defendants directly or indirectly solicited, accepted, or received money from pool participants to invest in a commodity pool named Profit Management.

13.     Defendants directly or indirectly solicited these funds through two websites, *www.profitmanagement.biz* and *www.lendmeforprofit.com*, which both touted the Profit Management pool ("PM websites").  The PM websites claimed that Profit Management had "over 15 years of successful online futures trading experience … doing exactly what the 'Big Boys' and the Billionaires do inside the trading pit to move the market up or down any given

4

minute." The PM websites further claimed that Profit Management generated 5-7% return on the funds it traded "almost Every Single day" and promised potential pool participants they would "Double [their] Money in Less Than 5 months."

14. Profit Management promised that pool participants would receive monthly payments on their investments at rates that increased as the amount invested increased. For example, Profit Management promised 8.35% monthly profit on a $3,000 investment, 15% monthly profit on a $20,000 investment, and 21% monthly profit on a $60,000 investment.

15. The PM websites explained how they made money: "We generate our profit through 'FUTURES' trading. Just in case if you do not know what 'Future trading' [*sic*] is, simply put, the Future trading involves speculating on the price of a commodity going up or down in future [*sic*]. Economic conditions do not matter. We make money in both UP and DOWN markets."

16. The PM websites purported to disclaim that Profit Management was a "Commodity Pool Operator or Commodity Trading Advisor or a broker" and stated, "this is NOT an investment. You are simply loaning your money to us." However, despite this purported disclaimer, the PM websites admitted what was obvious—that Profit Management was seeking money from investors for futures trading. PM's websites included purported pool participant testimonials referring to the funds as investments. One such testimonial claimed, "I have … profited on my investment. I am so happy & pleased that I will eventually invest more … so I can receive even bigger returns." Another testimonial claimed, "I invested $3000 in Profit Management … [t]his is by far the best investment I have ever made."

17. The PM websites explicitly described how and why the money would be pooled. One website stated: "Why Do We Need Your Money…? Well, have you heard of the saying

'IT TAKES MONEY TO MAKE MONEY'? … The Bigger [sic] the account the more leverage we have to extract much bigger profit each day trading from the market. The Bigger [sic] the account the more money you make."

18. Pool participants received account statements purporting to reflect the amount of money that was held in their name. One statement reminded a pool participant to promote the pool and make referrals. However, the account statement also read: "this is a very private & discreet offer… the kind of people we do not accept in the program are attorneys, lawyers, bankers and the people who work for any government agencies. Please avoid talking to them about our offer."

19. Defendants did not disclose to pool participants that their funds would be entrusted to Defendants, or even that Defendants were affiliated with the pool.

20. In their communications with pool participants, including account statements and so-called profit sharing agreements, Defendants used the address 8460 W. Lake Mead Blvd., Suite 100, Las Vegas, NV 89128 for Profit Management. This address was a virtual office that provided services like mail forwarding. Elfrimi wrote checks to pay for those virtual office services using funds received from pool participants.

21. The amount invested by individual pool participants ranged from $5,000 to $330,000. In total, pool participants invested at least $1,191,000. However, only $427,247.30 of the pool participants' principal has been repaid.

**B.   Defendants Commingled Pool Funds with Non-Pool Funds, and Used Pool Funds for Non-Pool Purposes and to Make Ponzi-Style Payments**

22. Pool participant funds were not pooled in any trading or bank account held in the name of Profit Management as a separate legal entity.

23. Instead, pool participants' funds were deposited into individual bank accounts in the names of and controlled by Sarwar and Elfrimi.

24. Sarwar controlled two Nevada State Bank accounts ("NSB accounts") opened under the name "Hasan Sarwar d/b/a Profit Management INT." In order to open the accounts, Sarwar used the Fictitious Firm Name certificate that he had obtained from the county clerk's office in Clark, County, Nevada (where Las Vegas is located). To obtain the Fictitious Firm Name certificate for Profit Management and to open the NSB account, Sarwar claimed to operate a business with that name at 8460 W. Lake Mead Blvd., Suite 100, Las Vegas, NV 89128—the same address for Profit Management used in communications with pool participants.

25. During the Relevant Period, Sarwar deposited checks from Profit Management pool participants totaling $617,000 into the NSB accounts. After all the funds had either been misappropriated or used to make monthly payments in furtherance of the scheme, the NSB accounts ceased activity in May 2014, and were liquidated by a final cash withdrawal and closed in October 2014.

26. Elfrimi controlled a JPMorgan Chase account ("JPMC account") under the name "Rachida Elfrimi d/b/a Profit Management." In order to open the account, Elfrimi used the Fictitious Business Name certificate she had obtained from the county clerk's office for San Bernardino County, California, where both she and Sarwar lived. Elfrimi used the apartment that she and Sarwar shared in Rancho Cucamonga, California, as the address for the JPMC account.

27. During the Relevant Period, Elfrimi deposited checks from Profit Management pool participants totaling $574,000 into the JPMC account. After all the funds had either been

7

misappropriated or used to make monthly payments in furtherance of the scheme, the JPMC account was liquidated by a final cash withdrawal and closed in February 2014.

28.     Money in the bank accounts used for the Profit Management pool were commingled with Sarwar and Elfrimi's own funds and held in accounts that they personally owned and controlled.  Similarly, the pool participants' funds were not traded in a separate account in the name of the pool.  Rather, to the extent that pool participants' funds were used at all for trading, Sarwar used those funds for futures trading in his own pre-existing personal trading accounts at AMP Global Clearing ("AMP"), a futures commission merchant registered with the Commission.

29.     As previously noted, defendants deposited investments from pool participants in both JPMC and NSB accounts.  For example, Victim A and his wife initially invested a total of $5,000 into the pool in May 2013 by writing a check to "Profit Management."  Elfrimi deposited that first check into the JPMC account on or around May 16, 2013.  That same day, Elfrimi wrote checks to make Ponzi-style payments to seven other investors, and one more the next day.  In addition to using money in the JPMC account to make Ponzi-style payments to pool participants from other participants' funds, Elfrimi then used some of the money for concert-related purchases, gasoline, and personal shopping.

30.     Subsequently, in June 2013, Victim A and his wife invested an additional $15,000 with a check for that amount to "Profit Management."  Sarwar deposited that check along with checks from seven other investors into an NSB account on or around June 11, 2013.  That same day, Sarwar transferred some of those funds to his personal trading account at AMP.  On June 20, 2013, Sarwar then wrote a check from the NSB account for $20,000 to Profit Management that was deposited into the JPMC account that Elfrimi controlled.  After that, Sarwar used the

funds in the NSB account to wire more money to his personal trading account at AMP and paid the monthly rent for an apartment that he and Elfrimi rented together.

31.     In total, Victim A and his wife invested $330,000 in the pool.  Of that amount, $222,000 was deposited into one of Sarwar's NSB accounts and $108,000 into Elfrimi's JPMC account.  Victim A and his wife received back only $41,529.75 of that investment.

32.     Sarwar and Elfrimi used pool participant funds from the NSB and JPMC accounts to transfer money to other accounts held or controlled by Sarwar, to send returns to pool participants in the form of Ponzi payments using funds of other participants, and also for personal and business transactions, such as apartment rent, international travel, auto repair, and grocery store purchases.

33.     When payments were made to pool participants from the NSB or JPMC accounts, Sarwar and Elfrimi used checks that bore the name "Profit Management" and the same aforementioned Las Vegas address.  When Sarwar or Elfrimi wrote checks to each other or to other entities besides the pool participants, the checks bore their individual name, the name "Profit Management," or no name at all.

**C.     Sarwar's Futures Trading Losses Were Not Disclosed to Pool Participants**

34.     During the Relevant Period, Sarwar transferred funds from the NSB accounts to his personal futures trading account at AMP.  Sarwar's AMP account was the only futures trading account that used funds from pool participants.

35.     During the relevant period, the AMP account showed trading in futures, including Mini Russell 2000 Index futures contracts that were and are listed and cleared by ICE Futures US ("ICE").  ICE is a registered entity that has been designated as a contract market by the Commission and is located at 55 East 52nd Street, New York, NY 10055.

36. Despite the greatly inflated claims that Profit Management traders were earning *daily* returns of 5 to 7%, the only account that ever received pool participants' money (Sarwar's personal trading account at AMP) did not show a successful trading history. Rather, prior to the Relevant Period, the account showed consistent monthly losses. Similarly, during the Relevant Period, the account showed an average of about $19,000 in losses per month. These losses both prior to and during the Relevant Period were not disclosed by the Defendants to the pool participants.

**D.     Sarwar Re-Names the Scheme**

37. Pool participants stopped receiving returns in late 2013 or early 2014, although Sarwar continued trading futures using the funds from pool participants through at least July 2014.

38. In late 2013, some pool participants were told by email or on the face of their account statements that the purported president of Profit Management was very ill and had returned to England.

39. In December 2013, a separate Nevada corporation named Profit Management, Inc. was dissolved by the Nevada Secretary of State. Sarwar caused the dissolution to occur by writing a check for the mandatory fee from an NSB account.

40. Around the same time, Sarwar became the shareholder of a company called Broadlong Ltd. ("Broadlong"), located in London, England and was listed as a director of Broadlong.

41. By early 2014, communications on behalf of Broadlong notified pool participants that the purported founder of Profit Management had died and that Profit Management was being acquired by Broadlong.

42. Pool participants never received any further payments from Broadlong or Profit Management.

## V.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

### FRAUD IN CONNECTION WITH SALE OR PURCHASE OF FUTURES CONTRACTS IN VIOLATION OF SECTION 4b(a)(1)(A) AND (C) OF THE ACT

43. Paragraphs 1 through 42 are re-alleged and incorporated herein by reference.

44. Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C) (2012), makes it unlawful for any person, in or in connection with any order to make, or in the making of, any contract of sale of any commodity for future delivery, that is made or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person–(A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person.

45. By the conduct alleged herein, Defendants Sarwar and Elfrimi cheated or defrauded or attempted to cheat or defraud other persons and willfully deceived or attempted to deceive other persons in connection with the making of contracts for sale of a commodity for future delivery, by taking the money from pool participants into personally controlled bank accounts, using that money for trading in personal accounts, and otherwise misappropriating pool participants' funds.

46. Both Sarwar and Elfrimi engaged in the acts and practices described above willfully or recklessly.

47. By this conduct, Sarwar and Elfrimi violated Section 4b(a)(1)(A) and (C) of the Act as described in this Count.

48. Each act of misappropriation and misrepresentation or omission of material fact, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation by Defendants of Section 4b(a)(1)(A) and (C) of the Act.

49. Sarwar willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Elfrimi, or acted in combination or in concert with Elfrimi in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Elfrimi which, if directly performed or omitted by Sarwar or another would be a violation of the Act or Regulations,. Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012), Defendant Sarwar therefore violated Section 4b(a)(1)(A) and (C) of the Act, as described in this Count.

50. Elfrimi willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Sarwar, or acted in combination or in concert with Sarwar in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Sarwar which, if directly performed or omitted by Elfrimi or another would be a violation of the Act or Regulations. Pursuant to Section 13(a) of the Act, Defendant Elfrimi therefore violated Section 4b(a)(1)(A) and (C) of the Act, as described in this Count.

## COUNT II

### FRAUD AND DECEIT IN VIOLATION OF
### SECTION 4*o*(1)(A) AND (B) OF THE ACT

51.     Paragraphs 1 through 42 are re-alleged and incorporated herein by reference.

52.     Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012), makes it unlawful for a CPO or associated person ("AP") of a CPO, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

53.     Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), defines a CPO as "any person … engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds … for the purpose of trading in commodity interests."

54.     During the Relevant Period, Sarwar and Elfrimi solicited, accepted, and received the funds invested by multiple pool participants, which were pooled together into bank accounts held by Sarwar and Elfrimi personally, and partially transferred to a futures trading account held by Sarwar for the purpose of trading in commodity interests.  Sarwar and Elfrimi used funds from the pool participants for trading in Sarwar's personal account without disclosing that fact to participants or obtaining their consent to do so.

55.     By this conduct, Defendants Sarwar and Elfrimi both individually acted as a CPO and violated Section 4*o*(1)(A) and (B) of the Act.

56.     Each act of misappropriation and misrepresentation or omission of material fact, including, but not limited to, those specifically alleged herein, is alleged as a separate and

13

distinct violation including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1)(A) and (B) of the Act.

57. Sarwar willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Elfrimi, or acted in combination or in concert with Elfrimi in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Elfrimi which, if directly performed or omitted by Sarwar or another would be a violation of the Act or Regulations.  Pursuant to Section 13(a) of the Act, Defendant Sarwar therefore violated Section 4*o*(1)(A) and (B), as described in this Count.

58. Elfrimi willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Sarwar, or acted in combination or in concert with Sarwar in such violations of the Act, or willfully caused acts to be done or omitted by Sarwar which, if directly performed or omitted by Elfrimi or another would be a violation of the Act or Regulations.  Pursuant to Section 13(a) of the Act, Defendant Elfrimi therefore violated Section 4*o*(1)(A) and (B), as described in this Count.

## COUNT III

### FAILURE TO OPERATE A COMMODITY POOL AS A SEPARATE LEGAL ENTITY AND COMMINGLING OF POOL FUNDS IN VIOLATION OF REGULATION 4.20(a) AND (c)

59. Paragraphs 1 through 42 are re-alleged and incorporated herein by reference.

60. With certain specified exceptions and exemptions not applicable here, Regulation 4.20(a), 17 C.F.R. § 4.20(a) (2017), requires a CPO to operate his or her commodity pool as an entity cognizable as a legal entity separate from that of the pool operator.

61. Regulation 4.20(c) states that no CPO may commingle the property of any pool that the CPO operates, or that the CPO intends to operate, with the property of any other person.

62.     During the Relevant Period, Sarwar and Elfrimi, while acting as CPOs, violated Regulation 4.20(a) and (c) by failing to operate the commodity pool as a legal entity separate from themselves and by commingling the property of the commodity pool with the funds of Sarwar and/or Elfrimi.

63.     Each act of failure to operate as a separate entity and commingling of pool funds with funds of others is alleged as a separate and distinct violation of Regulation 4.20(a) or (c).

64.     Sarwar willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Elfrimi, or acted in combination or in concert with Elfrimi in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Elfrimi which, if directly performed or omitted by Sarwar or another would be a violation of the Act or Regulations.  Pursuant to Section 13(a) of the Act, 7 , Defendant Sarwar therefore violated Regulation 4.20(a) and (c), as described in this Count.

65.     Elfrimi willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Sarwar, or acted in combination or in concert with Sarwar in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Sarwar which, if directly performed or omitted by Elfrimi or another would be a violation of the Act or Regulations.  Pursuant to Section 13(a) of the Act, , Defendant Elfrimi therefore violated Regulation 4.20(a) and (c), as described in this Count.

### COUNT IV

### FAILURE TO REGISTER AS CPOS IN VIOLATION OF SECTION 4m(1) OF THE ACT

66.     Paragraphs 1 through 42 are re-alleged and incorporated herein by reference.

67.     With certain specified exceptions and exemptions not applicable here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), makes it unlawful for any CPO to make use of the

mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered with the Commission.

68. As set forth above, Sarwar and Elfrimi acted as CPOs during the Relevant Period in that they conducted a business that solicited, accepted, and received funds invested by multiple pool participants which were pooled together into accounts controlled by Sarwar and Elfrimi for the purpose of trading in commodity interests.

69. In connection with their business as CPOs, Sarwar and Elfrimi used the mails and other means or instrumentalities of interstate commerce.

70. Sarwar and Elfrimi violated Section 4m(1) of the Act by engaging in these activities without having registered as a CPO.

71. Each use by Sarwar and Elfrimi of the mails or any means or instrumentality of interstate commerce in connection with their business as CPOs without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act.

72. Each act of failure to register as a CPO constituting a violation of Section 4m(1) of the Act, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

73. Sarwar willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Elfrimi, or acted in combination or in concert with Elfrimi in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Elfrimi which, if directly performed or omitted by Sarwar or another would be a violation of the Act or Regulations. Pursuant to Section 13(a) of the Act Defendant Sarwar therefore violated Section 4m(1), as described in this Count.

74. Elfrimi willfully aided, abetted, counseled, commanded, induced, or procured the commission of violations of the Act or Regulations by Sarwar, or acted in combination or in concert with Sarwar in such violations of the Act or Regulations, or willfully caused acts to be done or omitted by Sarwar which, if directly performed or omitted by Elfrimi or another would be a violation of the Act or Regulations. Pursuant to Section 13(a) of the Act, Defendant Elfrimi therefore violated Section 4m(1), as described in this Count.

## VI.

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

(a) An order finding that Defendants violated Sections 4b(a)(1)(A) and (C), 4*o*(1)(A)-(B), and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C), 6*o*(1)(A)-(B), 6m(1) (2012), and Regulation 4.20(a) and (c), 17 C.F.R. § 4.20(a), (c) (2017).

(b) An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly, in conduct in violation of Sections 4b(a)(1)(A) and (C), 4*o*(1)(A)-(B), and 4m(1) of the Act and Regulation 4.20(a) and (c).

(c) An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly, in:

    (i) trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    (ii)    entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account or for any account in which they have a direct or indirect interest;

    (iii)    having any commodity interests traded on their behalf;

    (iv)    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    (v)    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    (vi)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017);

    (vii)    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9);

(d)    An order directing Defendants to disgorge, pursuant to such procedure as the Court may order, all ill-gotten gains or benefits received from the acts and practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

(e) An order directing Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

(f) An order directing Defendants and any successors thereof to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

(g) An order directing each Defendant and any successors thereof to pay a civil monetary penalty under the Act to be assessed by this Court, in the amount of not more than the greater of: (i) triple the monetary gain to Defendants for each violation of the Act or Regulations or (ii) $170,472 for each violation of the Act or Regulations, plus post-judgment interest;

(h) An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

(i) An order providing such other and further equitable or remedial ancillary relief as the Court may deem appropriate.

## VII.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Dated:  September 28, 2017

                                            Respectfully submitted,

                                            ATTORNEYS FOR PLAINTIFF
                                            COMMODITY FUTURES TRADING COMMISSION

                                            Manal Sultan
                                            Deputy Director

                                             /s/ David Oakland
                                            David Oakland
                                            Trial Attorney
                                            *doakland@cftc.gov*

                                            Michael R. Berlowitz
                                            Trial Attorney
                                            *mberlowitz@cftc.gov*

                                            David Acevedo
                                            Chief Trial Attorney
                                            *dacevedo@cftc.gov*

                                            Commodity Futures Trading Commission
                                            Division of Enforcement
                                            140 Broadway, 19th Floor
                                            New York, NY 10005
                                            Telephone:  (646) 746-9700
                                            Fax:  (646) 746-9940